## Appeal of YOUGH BREWING CO.

*Docket No. 2384.   Decided July 31, 1926.*

1. The taxpayer filed with the Commissioner an appeal from a so-called 30-day letter and a claim in abatement of proposed additional tax for 1918. While the appeal was pending, it received a notice and demand for payment from a collector, and then offered for filing another claim in abatement for the same tax. Subsequently, and under date of August 25, 1924, it received a letter from the Commissioner stating that its claim on the appeal had been examined and, after setting forth the reasons, stating "the claim will therefore be rejected." Thereafter, the taxpayer received a formal notice of deficiency for 1919, dated January 9, 1925, which also referred to a claim in abatement for 1918, and stated that the claim could not be accepted and will therefore be rejected. There was *no reconsideration by the Commissioner of* the 1918 claim subsequent to August 25, 1924. Taxpayer appealed within 60 days from the letter of January 9, 1925. *Held*, the Board has no jurisdiction of an appeal relating to the year 1918.

2. As a portion of the taxpayer's brewery plant was continued in use after 1919, although to a lesser extent, in making near-beer, an allowance for obsolescence can not be made for that year based on that portion becoming obsolete by the end of 1919.

3. In the absence of a segregation of the depreciated costs of those assets, the use of which was discontinued, the Board is unable to determine a reasonable allowance for their obsolescence.

*Maynard Teall, Esq.*, for the petitioner.
*B. G. Simpich, Esq.*, for the Commissioner.

### Before MARQUETTE and MORRIS.

This is an appeal from determinations of deficiencies in income and profits taxes of $17,015.29 for 1918 and $2,439.55 for 1919. The issues are (1) jurisdiction of the Board to hear and determine the appeal in so far as it relates to the year 1918, and (2) whether the taxpayer is entitled to deductions for alleged obsolescence of tangible assets resulting from prohibition legislation.

### FINDINGS OF FACT.

The taxpayer is a Pennsylvania corporation with its principal office in the City of Connellsville.

1. On January 24, 1924, the Commissioner sent to the taxpayer a formal letter stating an additional tax liability for 1918 of $17,015.29 and informing the taxpayer of its right to appeal to the Commissioner within 30 days in accordance with the provisions of section 250 (d) of the Revenue Act of 1921. On February 18, 1924, the Commissioner wrote to the taxpayer relative to its tax liability for 1917, as adjusted by the Bureau, and affirmed his earlier decision with respect to 1917. On March 6, 1924, a letter was sent by the Commissioner to the taxpayer stating that its tax liability for both 1917 and 1918 had been determined and closed in accordance with office letters dated January 1; [*sic*] 1924, and February 18, 1924, "since you did not avail yourself of the opportunity to file a formal appeal as required by Treasury Decision 3492." On or about March 10, 1924, a formal appeal covering both 1917 and 1918 was filed, which was signed by an accountant as agent of the taxpayer. On March 11, 1924, a claim in abatement of the proposed additional taxes for both 1917 and 1918 was filed, which contained this statement "We are making application for a hearing before the Committee on Appeals and Review, and for that reason we ask an abatement until we are granted a hearing before the above-mentioned Committee." Nothing further happened until May 21, 1924, when the Commissioner wrote to the taxpayer referring to the appeal filed March 10, 1924, and stating that it would be necessary to submit a new appeal signed by a corporate officer of the taxpayer and conforming to Treasury Decision 3492. Whereupon, under date of May 29, 1924, the taxpayer filed another appeal, also relating to 1917 and 1918, signed by its treasurer. The receipt of this appeal was ac-

knowledged by the Commissioner on June 3, 1924, and a conference was arranged to be held at the Bureau of Internal Revenue on June 26, 1924. The conference took place on or about that date.

On July 29, 1924, a notice and demand for payment of the additional tax for 1918 was sent to the taxpayer by the collector of internal revenue at Pittsburgh, Pa. On August 7, 1924, the taxpayer returned this notice to the collector, together with another claim in abatement for the 1918 tax, and at the same time wrote to the Commissioner as follows:

> We are in receipt of a bill from the Collector of Internal Revenue, Pittsburgh, Pa., for income and excess profits tax for the year 1918 in the amount of $17,015.29, which we believe is unjust and inequitable.
>
> In June we appeared at a hearing in Washington, D. C., but the representative of your Bureau explained under the rulings of your office, he could not allow any adjustment in our tax liability on account of adverse conditions caused in our business by prohibition legislation, but if the Committee of Appeals and Reviews saw the justice of our claim, relief could be granted. We understood from this that our case would be submitted to the Committee and no action would be taken in the assessment of additional taxes until it had handed down an opinion. But much to our surprise we receive a bill for $17,015.29 based on your office letter dated January 24, 1924, which would indicate that it had not been transmitted to the committee by the Audit Section with their recommendations. In our opinion this procedure is not in accord with a spirit of fairness and it is our belief that the Bureau does not aim to act so arbitrary.
>
> We respectfully request that you authorize the Collector of Internal Revenue at Pittsburgh, Pa., to accept the Claim for Abatement, a copy of which is attached, we are submitting to him and that we be accorded the privilege of having our case reviewed by higher authorities in your Bureau. We understand that this procedure is regular and are only asking for the same treatment as other taxpayers. If we have not made our contentions clear in the data previously submitted, we would like to combine all data pertinent to the case and submit it for consideration.

On August 25, 1924, a letter reading as follows was sent by the Commissioner to the taxpayer:

> Your claim for refund of $19,700.94 income and profits taxes for the years, 1917 and 1918 has been examined.
>
> The claim is based upon the statement that the rates of depreciation allowed by the Revenue Agent are not just and that allowance should be made for loss of useful life on account of the Prohibition Amendment.
>
> An examination of the depreciation schedule discloses that the amounts allowed upon the depreciable assets are considered reasonable by this office.
>
> Since the company continued in the similar line of business, the loss of useful life as outlined in Article 143, Regulations 45, does not apply.
>
> The claim will, therefore, be rejected.
>
> The rejection will officially appear in the next schedule to be approved by the Commissioner.

August 27, 1924, a letter was sent by the collector to the taxpayer returning the abatement claim for the year 1918 and containing the following paragraph:

This office also holds your abatement claim of $17,015.29 for the year 1918. In this connection you are advised that this office has no authority to withhold the collection of this tax or to accept your claim for abatement unless authorized by the Commissioner at Washington to do so.

On November 24, 1924, a so-called 30-day letter was sent to the taxpayer relating to the years 1919 and 1920, and stating "Reference is also made to your claim for the abatement of $17,015.29 additional income and profits tax for 1918," and a statement attached to the letter contains the following:

In reference to your claim for the abatement of $17,015.29 additional tax for 1918, you are advised that a claim for abatement can not be accepted since the provisions of section 250 (d) of the Revenue Act of 1918 have been complied with and your recourse lies in paying the tax and filing a claim for refund submitting therewith all the material facts relating to the claim in support of which they are offered and to the proper consideration of which they are essential.

Your claim will, therefore, be rejected pro forma.

A reply to the letter of November 24, 1924, was sent by the taxpayer on December 19, 1924, which contained this paragraph:

It is noted in paragraph 5, page 4 of your letter, that you state that our claim for abatement cannot be accepted since we were allowed the benefits of section 250 (d) of the Revenue Act of 1921. It is true we were granted the privilege of a verbal hearing on June 26, 1924, but we were not granted the privilege of an appeal from the decision of the Income Tax Unit, although your conferees at the hearing advised us that the case would go to the Committee on Appeals and Review which was then functioning. It is our desire to have the year 1918 reopened and all three years considered at one time. We should be at least accorded the privilege of an appeal to the United States Board of Tax Appeals, and believe that the provisions of S. M. 2282 III-33-1733 gives us the right for the year 1918, and the claim for abatement for 1918 should be accepted.

On January 9, 1925, a letter was sent by the Commissioner notifying the taxpayer of a deficiency for 1919 and an overassessment for 1920, and also containing the following:

Reference is also made to your claim for the abatement of $17,015.29 additional income and profits tax for 1918.

In the statement attached to the letter appears the following:

In reference to your claim for the abatement of $17,015.29 additional tax for 1918, you are advised that a claim for abatement cannot be accepted since the provisions of section 250 (d) of the revenue act of 1918 have been complied with and your recourse lies in paying the tax and filing a claim for refund submitting therewith all the material facts relating to the claim in support of which they are offered, and to the proper consideration of which they are essential.

Your claim will, therefore, be rejected.

The taxpayer's petition was filed with the Board on March 7, 1925.

2. Up until the time National prohibition became effective the taxpayer was engaged in the business of making and selling beer.

It owns buildings, machinery, and equipment which were designed and used for that purpose and also in part for manufacturing ice. The gross floor area of the buildings is 41,840 square feet, of which 3,811 square feet, or 9.1085 per cent, is occupied by the ice-making plant, and the balance by the brewery. About 58 per cent of the machinery and equipment belonged to the brewing plant and 42 per cent was devoted to refrigeration. Of the latter machinery and equipment, approximately 50 per cent was employed in supplying refrigeration for the brewery and the remaining 50 per cent in making ice prior to prohibition.

For about ten years prior to 1919 the taxpayer manufactured and sold approximately 20,000 barrels of beer each year. In 1919 it began making near-beer and in that year made 5,000 barrels; in 1920 it made about 12,000 barrels. Since 1920 the quantity manufactured has decreased until, in 1924, it amounted to 200 barrels. The taxpayer also manufactured about 100 barrels of root beer each year since 1918. In 1918 and prior years most of the ice manufactured was furnished to saloon-keepers with beer and included in the price charged for the beer, or used for icing refrigerator cars. About 20 per cent was sold otherwise to persons who would take delivery at the plant. Since 1918 the ice-making plant has been operated to about 50 per cent of its capacity in producing ice which is sold to the public.

In the manufacture of near-beer the same machinery and equipment is used as was employed formerly in making real beer, except that in 1920 only nine out of a total of twenty fermenting tubs were used in making 12,000 barrels of near-beer, and the number in use has decreased gradually until in 1924 only one tub was used; the racking room is not used, as the near-beer is not barreled but is racked into tanks for bottling. Before prohibition there were three or four brews per week. The extent of use of the equipment has decreased gradually until in 1924 there were three brews during the year and the quantity in each brew was 65 or 70 barrels, as compared with 200 barrels before. The near-beer is left in chip tanks five or six days and is ready for the market within ten days; the real beer was stored three months.

Because of their location and character of construction and the local conditions existing in Connellsville, the buildings and plant could not be adapted economically to uses other than the manufacture of malt beverages and ice.

The depreciated cost of the buildings on January 1, 1918, was $99,-681.00, and that of the machinery and equipment was $105,270.47.

### OPINION.

MORRIS: The taxpayer relies on the letter of January 9, 1925, as the notice of determination of a deficiency by the Commissioner which gives it the right to appeal to the Board as to the year 1918 as well as 1919, and argues that this was a notice of final determination by the Commissioner. A chronicle of the events preceding this letter is set forth fully in the findings of fact. The taxpayer was notified on January 24, 1924, of a proposed deficiency and of its right to appeal to the Commissioner in accordance with the provisions of section 250 (d) of the Revenue Act of 1921, within 30 days. No appeal was filed until March 10, 1924, and on the following day a claim in abatement was filed. Nothing further happened until May 21st, when the appeal was returned to the taxpayer because it was not executed in conformity with Treasury Decision 3492. Thereupon, a corrected appeal was filed on May 29, 1924. The claim in abatement and the appeal related to both the years 1917 and 1918. On June 3, 1924, the taxpayer was informed a conference thereon had been arranged for June 26, 1924, and the conference was duly held. By accepting the appeal after the expiration of 30 days from January 24, and considering the taxpayer's claims thereon, the Commissioner waived the 30-day requirement. On July 29, 1924, the taxpayer received a notice and demand for payment of the 1918 deficiency from the collector and thereupon submitted another claim in abatement for 1918. It does not appear when the assessment was made. On August 25, 1924, the letter set out in full in the findings was sent by the Commissioner. It states that the claims for both 1917 and 1918 had been examined and rejected and the reasons for the rejection are given. This was a decision of the taxpayer's appeal under section 250 (d). It does not appear that the Commissioner reconsidered the claims after that date or made any new determination, so that decision stands as the determination of the Commissioner. The letters of November 24, 1924 and January 9, 1925, not only fail to show that the Commissioner reconsidered the case or made a redetermination, but each one states that the taxpayer's claim for abatement of the 1918 deficiency can not be accepted. These letters do not mention 1917 and obviously refer to the second abatement claim for 1918. The action of the Commissioner in informing the taxpayer that this claim could not be accepted can not be construed as evidence of a reconsideration of the taxpayer's claims, or of a redetermination of the deficiency. We therefore hold that the Board has no jurisdiction to hear and determine the appeal as to the year 1918.

Because of the approach of the effective date of prohibition, the taxpayer stopped brewing beer in 1919. It then commenced making near-beer. The testimony shows that thenceforth certain parts of the buildings and brewing plant were not used, but that in manufacturing near-beer the balance of the brewery was used in the same manner as before. The portion used, however, was operated in 1919 only to about 25 per cent of capacity, as measured by the quantity of beverage produced. In 1920, by the same measurement, such portion was operated to 60 per cent of capacity; but from then on the extent of use gradually diminished until, in 1924, it was but a small fraction of the previous use. It is also shown that since 1918 the ice-making plant has been used only to about 50 per cent of its capacity, owing to the fact that refrigeration is not required for near-beer as it was for real beer, and that the taxpayer could not sell to the public a quantity of ice greater than 50 per cent of the plant's capacity.

The taxpayer advances the proposition that such use as was made of the plant subsequent to cessation of beer manufacture was for the purpose of increasing the salvage, and it is entitled therefore to an allowance for obsolescence, over the period from February 1, 1918, to December 31, 1919, of the difference between the depreciated cost and the value in such use, i. e., the alleged salvage value. It is argued, further, that all breweries *ipso facto* became obsolete with prohibition. These propositions are based on assumptions of fact which we are not warranted in making. The question is not, what effect prohibition had on the business of manufacturing and selling beer. There is no doubt about that. What we have to decide is its effect on the utility and value of the physical assets. If they were not as a matter of fact capable of other uses, prohibition rendered them obsolete. But we can not assume all brewery plants are similarly circumstanced in respect of utility for purposes other than the manufacture of prohibited beverages. The facts must be established in each case.

Obsolescence is defined as the state of becoming obsolete. Webster's New Int. Dict.; *Appeal of Columbia Malting Co.*, 1 B. T. A., 999. Obsolete is defined as meaning " no longer in use; disused; neglected." Webster's Dict. If property is continued in use for several years after 1919, as the evidence shows a portion of this brewery plant was, how can it be said that that portion became obsolete in that year? The part used required no alteration or reconstruction for such use; it apparently was as equally well adapted for making near-beer as it was for making the other kind. The fact that it was not operated to full capacity is not evidence that it was then obsolete. In 1920 it produced 60 per cent of the quantity of beverage formerly manufactured. It is urged that the taxpayer

should not be made to suffer because it in effect attempted to increase the amount of salvage when it knew there was small chance of successful operation. This argument presupposes that the taxpayer was attempting only to realize salvage, a premise with which we do not agree. We must presume that the taxpayer's officers were exercising their best business judgment and that in so doing they saw a reasonable prospect of a profitable business in near-beer. We can not credit them with power to prophesy in 1919 that the public would not take to near-beer. If that fact could have been foreseen, Would they have gone into the near-beer business? We think not. Because their expectations for profitable business were not realized, they can not now maintain that the plant was obsolete when they began making near-beer. In the *Appeal of Columbia Malting Co.*, *supra*, we said:

In order that the taxpayer may be entitled to the obsolescence deduction in the years involved, there must have been substantial reasons for believing that the assets would become obsolete prior to the end of their ordinary useful life, and second, it must have been known, or believed to have been known, to a reasonable degree of certainty, under all the facts and circumstances, when that event would likely occur.

Subsequent events may have demonstrated that the plant had become obsolete for near-beer manufacture, as well as for every other purpose, but we can not determine obsolescence in 1919 from what happened later. The evidence does not sustain the contention that the portion of the brewery used for making near-beer became obsolete at the close of 1919.

It appears that some parts of the brewery which were not used in making near-beer, such as the racking room, became obsolete in 1919, but there is not in evidence data which will enable us to find the amount of obsolescence of those parts.

> *The petition is dismissed as to the year 1918.*
> *The deficiency for 1919 is $2,439.55. Order*
> *will be entered accordingly.*